FILED

06/02/2026

Bowen Greenwood
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 25-0266

DA 25-0266

IN THE SUPREME COURT OF THE STATE OF MONTANA

2026 MT 118

STATE OF MONTANA,

       Plaintiff and Appellee,

  v.

BRENT JAMES OLSON,

       Defendant and Appellant.

APPEAL FROM:    District Court of the Fourth Judicial District,
In and For the County of Missoula, Cause No. DC-21-550
Honorable Leslie Halligan, Presiding Judge

COUNSEL OF RECORD:

       For Appellant:

          Colin M. Stephens, Stephens Brooke, P.C., Missoula, Montana

          Peter F. Lacny, McFarland Molloy Lacny & Duerk, Missoula, Montana

       For Appellee:

          Austin Knudsen, Montana Attorney General, Thad Tudor, Assistant Attorney General, Helena, Montana

          Matthew C. Jennings, Missoula County Attorney, Ryan Mickelson, Brittany Williams, Deputy County Attorneys, Missoula, Montana

Submitted on Briefs:  March 4, 2026

Decided:  June 2, 2026

Filed:

_____
                 Clerk

Justice Jim Rice delivered the Opinion of the Court.

¶1 Brent Olson appeals the March 28, 2025 Judgment issued by the Fourth Judicial District Court, Missoula County, following Olson's conviction for Incest after a jury trial. The issues on appeal are:

1. *Whether the District Court violated Olson's constitutional right to present a defense and confront witnesses by excluding evidence under Montana's rape shield statute of alternative sources for the alleged victim's age-inappropriate sexual knowledge.*

2. *Whether the District Court's rape shield rulings unreasonably and unconstitutionally restricted Olson's right to cross-examine his accuser.*

We affirm.

### FACTUAL AND PROCEDURAL BACKGROUND

¶2 Olson and his wife divorced in 2014 but continued to share parenting responsibilities. They are the biological parents of two children: a son, C.O., born in 2008, and a daughter, M.O., born in 2011. After the divorce, M.O. and C.O. lived primarily with their mother and stepfather.

¶3 On September 24, 2021, the State charged Olson with sexual assault of M.O. The Information alleged that, over a period of years when M.O. was between approximately five and nine years old, Olson sexually assaulted M.O. by touching her and forcing her to touch his penis. Olson was 53 years old at the time of the allegations. On March 21, 2023, the State filed a Second Amended Information charging two counts of Incest, one involving M.O. and one involving C.O., and omitted the sexual assault charge. The District Court

2

severed the two Incest counts for separate trials, with M.O.'s trial proceeding first. The Incest count involving C.O. was ultimately dismissed by the State at sentencing.

¶4      The allegations against Olson first surfaced when M.O. made the disclosure to her stepfather, who had married her mother, during "king's court," an exercise conducted by M.O.'s stepfather wherein M.O. could speak freely to him without fear of punishment. Olson described the stepfather's "king's court" exercise as coercive. During trial, the stepfather admitted to disliking Olson, in part because Olson had dated the stepfather's sister after Olson's divorce from M.O.'s mother. M.O. eventually told her stepfather about the abuse during "king's court," and the stepfather informed the authorities.

¶5      In a First Step forensic interview, M.O. described the alleged abusive conduct, including describing Olson's penis as feeling "hard" when she touched it and stating a "weird liquid" came out of it that felt like "mixed slime." M.O. explained that Olson would touch her body part that she used to "pee." M.O. explained the touching happened when Olson would lie with her in the same bed and that Olson would also touch her breasts. She described Olson's penis as "scrunched up" when he wore pants but "pointed out" when Olson wore underwear. M.O. also said that "a while back" some "touching things happened . . . with a kid," but provided no other detail. During a forensic interview with C.O., pornography was discovered on his phone and C.O. said that M.O. had used his phone, but only to play games or watch YouTube.

¶6      Throughout the investigations, the details regarding the alleged touching between M.O. and C.O. remained vague, including what specific events M.O. was describing and

3

her age at the time of those events. The State argued that C.O. and M.O. were likely nine and seven, which the District Court interpreted as "support[ing] [the State's] position that it was prepubescent." In one interview, M.O. mentioned an incident wherein several children were comparing "what they had" regarding "their genitals," but provided no further detail. Olson suggested in argument that this touching was likely more than "hugging at a bus stop and certainly more than just touching an arm." The State told the District Court that, "based on the context of the conversations," this touching was "maybe . . . sexual in nature." Counsel stated the defense had requested additional interviews of both C.O. and M.O. to discuss the touching, but were denied.

¶7 Before trial, the State filed a motion in limine seeking to exclude evidence of, among other things, (1) the pornography on C.O.'s phone and (2) any alleged inappropriate touching between M.O. and C.O. The State argued that both were barred by Montana's rape shield statute, § 45-5-511(2), MCA, irrelevant, and substantially more prejudicial than probative. Olson objected to their exclusion. His defense theory, articulated repeatedly in pretrial filings and hearings, was that M.O.'s age-inappropriate sexual knowledge came from sources other than abuse by Olson. Defense counsel predicted, correctly, that the State would argue in closing that M.O.'s detailed descriptions could only have come from sexual abuse by Olson. To rebut that anticipated argument, Olson sought to introduce two alternative sources of M.O.'s knowledge: adult pornography discovered on C.O.'s phone and inappropriate touching between the siblings.

4

¶8 Prior to the hearings conducted on the State's motion in limine, the District Court entered an order prohibiting the parties from offering evidence suggesting M.O. and C.O. had sexual contact with each other or that C.O. had pornography on his phone. At a later hearing, Olson argued the pornography was legal pornography, not photographs of M.O., and should be introduced because it was a "theme throughout the case" and a "theme throughout the investigation." The court responded that it would benefit from the opportunity to review M.O.'s First Step interview, and wanted to know more about the timeframe when C.O. may have downloaded the pornography and whether it could provide any relevance to statements made by M.O. The parties agreed to provide the court with a police report on the images on C.O.'s phone and a transcript of M.O's interview for the court's review.

¶9 At a subsequent hearing, Olson again requested reconsideration of the District Court's granting of the State's motion in limine. As to the pornography on C.O.'s phone, Olson argued the evidence was admissible because it was a "very important part of [his] defense," was something law enforcement investigated, and was not remote in time. Olson argued the pornography on C.O.'s phone went to a question at the heart of the case: where else could M.O. have learned the things she described at her First Step interview. Olson also argued that the pornography was where M.O. could have learned the matters she described, that the evidence was "absolutely relevant and admissible and should not be excluded," and that if it was excluded, it "would be hurting a big part of Mr. Olson's defense."

5

¶10　Trial began on March 25, 2024, with a meeting among the parties, including Olson, where the Rape Shield issues were again raised. The District Court noted its need to "balance the victim's rights under the [Rape Shield] law with the Defendant's Constitutional rights." Both parties presented argument, with a lengthy discussion occurring with the District Court. Consistent with its pretrial rulings, and the absence of any new foundation or nexus, but subject to M.O.'s upcoming trial testimony, the District Court maintained its exclusion of the evidence. Regarding the pornography on C.O.'s phone, the District Court stated:

> [U]nless [M.O.] says she was influenced by it, unless she says she saw it, unless it had some bearing on her knowledge or the statements that she's made—I'd hate to have this trial become all about the pornography on [C.O.'s] phone, which could very well turn to that. And she may—I don't know if she even knows that [C.O.] had pornography on his phone at this juncture. So I'm not going to raise it—or allow it to be raised unless she independently provides that information, and then we can readdress the scope.

¶11　Regarding the alleged sibling touching, the District Court stated:

> [G]iven my review of what typically is discussed under Rape Shield in the balancing of information I guess I don't have enough information to indicate that any of this touching was similar enough in—to the information here— and of course we haven't heard [M.O.'s] testimony, and certainly if it comes up that there was more, and there was more touching and that it's impacted her or had some bearing on the charges against Mr. Olson, then we may need to revisit it, but at this point I don't see it coming in. . . . [A]t this juncture I guess in balance I would think that any of that would be omitted unless, as I said, [M.O.] testifies to something different, and in fact the contact they had was more of a sexual nature with [C.O.].

¶12　M.O. testified at trial consistently with her forensic interview, describing the charged acts in detail. When asked about C.O.'s phone, she stated that she had used it only

6

to play games. She never mentioned pornography, viewing adult material, or any connection between the phone and her sexual knowledge. She likewise made no reference to the touching with or by other children. Olson testified in his own defense and denied all allegations, explaining he and M.O. had a good relationship and that he was shocked to learn of the allegations. Olson could not explain where M.O. might have come up with the allegations.

¶13 During closing argument, the State repeatedly emphasized that M.O.'s detailed sexual knowledge could have come from one source, Olson himself. The prosecutor told the jury that a little girl does not know what an erect penis feels like or what semen feels like unless she has been abused. In rebuttal, the State argued there was no other explanation or source for M.O.'s knowledge other than abuse by Olson.

¶14 The jury convicted Olson. The District Court sentenced him to 100 years in the Montana State Prison with 85 years suspended.

¶15 Olson appeals.

**STANDARD OF REVIEW**

¶16 Trial evidentiary decisions are generally reviewed for abuse of discretion, and the trial court is given broad discretion to determine the admissibility of evidence. *State v. Lake*, 2019 MT 172, ¶ 22, 396 Mont. 390, 445 P.3d 1211 (citations omitted). "'A district court abuses its discretion if it acts arbitrarily, unreasonably, or without employing conscientious judgment, resulting in substantial injustice.'" *State v. Twardoski*, 2021 MT 179, ¶ 13, 405 Mont. 43, 491 P.3d 711 (quoting *State v. Pope*, 2019 MT 200, ¶ 10,

7

397 Mont. 95, 447 P.3d 469). "Where a district court's evidentiary ruling is based on its interpretation of a statute, this Court reviews the district court's ruling de novo for correctness." *Twardoski*, ¶ 14 (citing *Lake*, ¶ 22).

## DISCUSSION

¶17 *1. Whether the District Court violated Olson's constitutional right to present a defense and confront witnesses by excluding evidence under Montana's rape shield statute of alternative sources for the alleged victim's age-inappropriate sexual knowledge.*

¶18 A district court has broad discretion in determining the relevancy and admissibility of evidence, but remains bound by the Rules of Evidence and applicable statutes. *Twardowski*, ¶ 14 (citing *Lake*, ¶ 22). Montana's rape shield statute provides, in pertinent part:

> Evidence concerning the sexual conduct of the victim is inadmissible in prosecutions under this part except evidence of the victim's past sexual conduct with the offender or evidence of specific instances of the victim's sexual activity to show the origin of semen, pregnancy or disease that is at issue in the prosecution.

Section 45-5-511(2), MCA.

¶19 A defendant has the right under the Sixth Amendment to the United States Constitution and Article II, Section 24, of the Montana Constitution, to confront his accuser and present evidence in his defense. *Lake*, ¶ 25 (citing *State v. Colburn*, 2016 MT 41, ¶ 24, 382 Mont. 223, 366 P.3d 258). "[T]he Constitution guarantees criminal defendants a meaningful opportunity to present a complete defense." *State v. Reams*, 2020 MT 326, ¶ 18, 402 Mont. 366, 477 P.3d 1118 (quoting *State v. Glick*, 2009 MT 44, ¶ 29, 349 Mont. 277, 203 P.3d 796). The Rape Shield statute's protections exist in potential tension with

these constitutional rights. *Lake*, ¶ 25 (citing *State v. Walker,* 2018 MT 312, ¶ 53, 394 Mont. 1, 433 P.3d 202). "Neither the Rape Shield Law nor the defendant's right to confront and present evidence are absolute." *State v. Colburn*, 2016 MT 41, ¶ 25, 382 Mont. 223, 366 P.3d 258 (citations omitted).

¶20 A district court must strike a balance between the protection of the alleged victim and the defendant's constitutional trial rights, and may not "arbitrarily or mechanically apply the Rape Shield Law to exclude evidence." *Walker*, ¶ 54 (citing *Colburn*, ¶ 25); *State v. Awbery*, 2016 MT 48, ¶ 20, 382 Mont. 334, 367 P.3d 346 ("it is the trial court's responsibility to strike a balance between the defendant's right to present a defense and a victim's rights under the statute"). In balancing those interests, the district court must assess whether the evidence is relevant and probative under M. R. Evid. 401 and 402, whether it is merely cumulative of other admissible evidence, and whether the probative value of the evidence is substantially outweighed by its prejudicial effect under M. R. Evid. 403. *Awbery*, ¶ 20 (citations omitted). "Under the rape shield statute, a 'court balancing the interests of the defendant with those protected by the Rape Shield Law should require that the defendant's proffered evidence is not merely speculative or unsupported.'" *Twardowski*, ¶ 27 (quoting *Awbery*, ¶ 20); *see also Walker*, ¶ 54 (quoting *Colburn*, ¶ 25). It is the responsibility of the district court under the Rape Shield statute to prevent "'sordid probes into a victim's past sexual conduct.'" *Lake*, ¶ 24 (quoting *Colburn*, ¶ 28).

¶21 Our prior decisions illustrate the application of the above principles. In *Colburn*, the defendant sought to introduce evidence that alleged victim R.W., a neighbor, had been

9

sexually abused by her own father as an alternative possible source for her detailed sexual knowledge. *Colburn,* ¶¶ 9, 26. The district court excluded evidence of any sexual encounter R.W. had had with any other person under the Rape Shield statute. *Colburn*, ¶ 21. This Court reversed, explaining the evidence Colburn wished to proffer was neither speculative nor unsupported as the father had previously been convicted of sexual abuse charges against R.W. *Colburn*, ¶ 25. We also explained the district court had erred by mechanically applying the Rape Shield statute that failed to balance Colburn's right to present a defense. *Colburn*, ¶ 29. Similarly, in *Twardowski*, defendant Twardowski sought to introduce evidence that the victim's detailed sexual knowledge and specific allegations stemmed from her prior sexual abuse from another person, Cody Hill, which involved an identical sexual "truth or dare" game with the same escalating dares and near-identical progression as the acts she alleged against Twardowski. *Twardowski*, ¶ 5. Twardowski also contended the victim had motive to lie because the victim liked Hill but despised Twardowski. *Twardowski,* ¶ 25. The district court excluded the evidence under the Rape Shield statute. *Twardowski*, ¶ 23. We reversed, concluding there was a "straight-line connection" between the victim's prior sexual abuse by Cody Hill and the specific allegations against Twardowski. The "straight-line connection" reasonably supported a finding that the evidence was relevant, non-cumulative, and that its probative value was not substantially outweighed by the danger of unfair prejudice or confusion: the conduct alleged against Twardowski was nearly identical to the conduct alleged against Hill, the

two incidents were separated by only a few weeks, and the victim had a motive to fabricate the allegations. *Twardowski*, ¶¶ 35–36.

¶22 By contrast, in *Awbery*, defendant Awbery sought to introduce evidence that three of the alleged victims had suffered prior sexual abuse by others to argue that the abuse caused PTSD, which in turn caused the victims to make erroneous allegations against him. *Awbery*, ¶ 13. The district court excluded the evidence after finding no evidence of pre-existing PTSD, no similarity between the prior incidents and Awbery's offenses, and a risk of jury confusion and distraction. *Awbery*, ¶ 15. We upheld the ruling, concluding the defense theory "never progressed past conjecture and speculation" because there was no foundation linking the prior abuse to false accusations or to PTSD existing before Awbery's offenses. *Awbery*, ¶ 21.

¶23 Olson emphasizes that without being able to introduce evidence of an alternative source for M.O.'s age-inappropriate sexual knowledge, his ability to mount a defense was constitutionally diminished. He argues that courts across the country have recognized that rape shield statutes cannot be applied mechanistically to exclude evidence of alternative sources for a child victim's age-inappropriate sexual knowledge when the prosecution argues that such knowledge could only have come from the defendant. Olson contends that once the State invites the jury to infer that the victim's detailed descriptions prove the charged abuse, the defendant has a constitutional right under the Sixth Amendment and Article II, Section 24, of Montana's Constitution to present evidence of other possible sources, such as exposure to pornography or sibling sexual contact, so that the jury is not

left with a false impression that the defendant is the only possible explanation. He maintains that the District Court's application of § 45-5-511(2), MCA, in this case unconstitutionally prevented him from rebutting the State's argument that Olson would be the only source of M.O.'s knowledge.

¶24 The State responds that the evidence Olson sought to introduce lacked a clear, non-speculative connection to M.O.'s allegations. The State notes that M.O. never testified she had seen adult content on C.O.'s phone, that visual pornography cannot explain the tactile experience she described, and that the sibling-touching allegations were vague and bore no similarity to the charged acts. Accordingly, the State submits that the District Court correctly balanced § 45-5-511(2), MCA, and Olson's constitutional rights, along with the rules of evidence, and did not abuse its discretion by excluding the evidence. The State contends the exclusions did not prevent Olson from presenting a complete defense or cross-examining M.O. and properly avoided turning the trial into a probe of M.O.'s prior sexual conduct.

¶25 The briefing of the parties is extensive. Upon review, including of the transcripts of the hearings and trial, we conclude the District Court correctly interpreted and applied the Rape Shield statute and appropriately balanced Olson's competing constitutional interests. The court did not mechanically exclude the evidence without a careful analysis of its foundation. It held multiple hearings, invited repeated argument from the parties, asked for additional evidentiary connection, and expressly recognized its obligation to balance M.O.'s rights under the Rape Shield statute with Olson's constitutional rights to

present a defense and confront his accuser. The court made clear that its pretrial order would be revisited if M.O.'s testimony supplied the necessary foundation or relevance during trial.

¶26 Specifically, the alleged sibling-touching assertions remained vague throughout the investigation, as neither the specific acts, the timing, nor M.O.'s age at the time were ever clearly established. M.O. mentioned that "a while back" some "touching things happened . . . with a kid," and provided no further detail. The District Court noted the alleged touching involved prepubescent children and lacked factual similarity to the specific acts M.O. described and her tactile experience. After hearing extensive argument, the District Court ruled the evidence would be excluded unless M.O.'s testimony revealed a greater nexus or showed that the touching had impacted her knowledge or the charges, but M.O. provided no such testimony. Consequently, the relevance of the alleged sibling touching was not established, was speculative and provided minimal probative value. *Awbery*, ¶ 20; *Lake*, ¶ 26.

¶27 The District Court repeatedly told the parties that evidence of pornography on C.O.'s phone would be admissible only if M.O. testified that she had accessed the phone, viewed adult content, and that an influence upon her sexual knowledge could be proffered. The court cautioned it did not want the trial to become "all about the pornography on [C.O.'s] phone" absent further appropriate foundation. M.O. testified only that she had used the phone to play games; she never mentioned pornography or any connection to her sexual knowledge. As the State points out, even had she acknowledged viewing the

13

material, visual pornography may not have provided a source of the tactile details M.O. described. The District Court's conditional approach, which left the door open for revisiting the issue upon provision of foundational evidence, demonstrated a conscientious balancing of interests rather than a mechanistic application of the statute. *Twardowski*, ¶ 13; *Awbery*, ¶ 20; *Walker*, ¶ 54.

¶28 Olson contends the exclusions mirror the constitutional error we identified in *Colburn*. In our view, this case aligns more closely with *Awbery*: the proffered evidence never moved beyond the realm of conjecture, despite the District Court leaving the door open for any additional testimony that might have established the required nexus or relevance. Its rulings were neither arbitrary nor unreasonable. *Twardowski*, ¶ 13.

¶29 *2. Whether the District Court's rape shield rulings unreasonably and unconstitutionally restricted Olson's right to cross-examine his accuser.*

¶30 Olson separately contends the District Court's rape shield rulings unconstitutionally restricted his right to cross-examine M.O. He argues that excluding evidence of the pornography on C.O.'s phone and the alleged sibling touching prevented him from effectively confronting M.O. about the source of her age-inappropriate sexual knowledge. Olson asserts this limitation violated his rights under the Sixth Amendment and Article II, Section 24, of the Montana Constitution because it left the jury with the unchallenged impression, one which the State repeatedly advanced in closing argument, that M.O.'s detailed descriptions could only have come from abuse by Olson.

¶31 Olson relies on *State v. Johnson*, 1998 MT 107, ¶¶ 21–23, 288 Mont. 513, 958 P.2d 1182, for the proposition that "[w]here application of the rape shield statute excludes

14

evidence that violates a defendant's constitutional rights, a court must admit the evidence notwithstanding the statute." However, in *Johnson*, we concluded that the excluded evidence was "speculative and unsupported, and therefore insufficient to tip the scales in favor of [the defendant's] right to present a defense and against the victim's rights under the rape shield statute." *Johnson*, ¶ 34. The same principle applies here. The pornography and sibling-touching evidence lacked sufficient connecting foundation to the charged acts, remained speculative and unsupported, and provided minimal probative value.

¶32 Although a defendant has a constitutional right to cross-examine his accuser, that right is not absolute. *Colburn*, ¶ 25. Cross-examination may be limited when the proposed inquiry is irrelevant, speculative, or substantially more prejudicial than probative. *Lake*, ¶ 26; *Awbery*, ¶ 20. As explained above, we conclude the District Court's rulings were consistent with our precedents and a correct application § 45-5-511(2), MCA. The District Court did not act arbitrarily, unreasonably, or without conscientious judgment, *Twardowski*, ¶ 13, and Olson was not unconstitutionally restricted in his cross-examination of M.O.

¶33 Affirmed.

/S/ JIM RICE

We Concur:

/S/ CORY J. SWANSON
/S/ KATHERINE M. BIDEGARAY
/S/ BETH BAKER
/S/ INGRID GUSTAFSON