FILED

07/20/2021

Bowen Greenwood
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 18-0543

DA 18-0543

IN THE SUPREME COURT OF THE STATE OF MONTANA

2021 MT 179

STATE OF MONTANA,

Plaintiff and Appellee,

v.

ALAN PETER TWARDOSKI,

Defendant and Appellant.

APPEAL FROM:     District Court of the Twenty-First Judicial District,
                 In and For the County of Ravalli, Cause No. DC 17-59
                 Honorable James A. Haynes, Presiding Judge

COUNSEL OF RECORD:

       For Appellant:

              Chad Wright, Appellate Defender, Kristina L. Neal, Assistant Appellate
              Defender, Helena, Montana

       For Appellee:

              Austin Knudsen, Montana Attorney General, Katie F. Schulz, Assistant
              Attorney General, Helena, Montana

              William E. Fulbright, Ravalli County Attorney, Hamilton, Montana

                                          Submitted on Briefs:  March 17, 2021

                                                     Decided:  July 20, 2021

Filed:

_____
                        Clerk

Justice Ingrid Gustafson delivered the Opinion of the Court.

¶1 Defendant and Appellant Alan Peter Twardoski (Twardoski) appeals from the June 1, 2018 Order Re: Cody Hill – CCJI and the July 26, 2018 Judgment issued by the Twenty-First Judicial District Court, Ravalli County, following his convictions for Sexual Assault, three counts of Sexual Intercourse Without Consent, and Sexual Abuse of Children, all felonies, after a jury trial.

¶2 We restate the issues on appeal as follows:

1. *Whether the District Court abused its discretion by not requiring the State to provide additional Confidential Criminal Justice Information from the Cody Hill investigation after it conducted an in camera review of the file.*

2. *Whether the District Court erred by excluding evidence of Cody Hill's near contemporaneous sexual abuse of I.A., thereby violating Twardoski's constitutional right to present a defense.*

¶3 We affirm in part, reverse in part, and remand for a new trial.

## FACTUAL AND PROCEDURAL BACKGROUND

¶4 In the summer of 2016, I.A., then thirteen years old, lived in a cabin with her mother on property owned by I.A.'s maternal grandparents near Corvallis. I.A.'s grandparents lived in the main house on the property, while one of I.A.'s older male cousins lived in another building near the cabin. I.A. was being home-schooled. I.A.'s mother was a drug addict who struggled with mental health and chemical dependency issues for years, including frequently abusing pain medications and methamphetamine. Since approximately 2005, I.A.'s mother had used drugs with—and those drugs were often provided by—Twardoski. I.A. first met Twardoski when she was about six or seven.

¶5      On June 27, 2016, Cody Hill, a nearly 40-year-old rancher and family friend of I.A., began to sexually abuse 13-year-old I.A.  The two would enter into a "relationship" which lasted for approximately a year and a half.  On their first night together, I.A. stayed with Hill as she was going to work on the ranch with him the next morning.  Hill provided I.A. with wine and the two drank together.  Hill told I.A. he was attracted to her and then convinced her to play a game of sexual "truth or dare."  As part of the game's "dares," Hill touched I.A.'s breasts; fingered her vagina, causing her pain; grabbed I.A.'s head when having I.A. perform oral sex on him; performed oral sex on I.A.; and threatened I.A. by saying his son would be taken away from him if she ever told anyone about what they did. Hill and I.A. also took a shower together.

¶6      On July 10, 2016, thirteen days after Hill employed this sexual game of "truth or dare" to sexually abuse I.A., she went for a driving lesson with Twardoski, her mother's 61-year-old friend and drug supplier, when I.A.'s mother was unable to take her because she was high on prescription drugs and methamphetamine.  I.A. and Twardoski drove for a while, before turning into a field and parking.  As alleged by I.A., once parked in the field Twardoski told her she was beautiful and then convinced her to play a sexual game of "truth or dare."  As part of the game's "dares," Twardoski touched I.A.'s breasts; fingered her vagina, causing her pain; grabbed I.A.'s head when having I.A. perform oral sex on him; performed oral sex on I.A.; and threatened I.A. by saying he would kill himself if she told anyone about what they did.  After returning to the cabin, I.A. went inside and took a shower.  I.A. left after showering and visited her cousin on the property, while Twardoski remained at the cabin with her mother.

¶7     Two days after her drive with Twardoski, I.A. was present when her mother and grandmother were arguing about how much time Twardoski was spending at the cabin. I.A.'s grandmother did not want Twardoski on the property, while her mother wanted to continue seeing (and using drugs with) him. During this argument, I.A. told her mother and grandmother that Twardoski had touched her body and she didn't like it. I.A. did not provide further details to her mother and grandmother at the time. I.A. then moved into the main house on the property with her grandparents, while her mother moved to Bozeman to live with her sister.

¶8     I.A. began going to counseling with Aleta Sisson, LCPC, in September of 2016. At her third session with Sisson, in late October 2016, I.A. told Sisson that she was "sexually assaulted by her mother's meth dealer." I.A. told Sisson the meth dealer's name was Alan and that it happened during a driving lesson in June or July of 2016. I.A. did not disclose any information about Hill's sexual abuse to Sisson. As a mandatory reporter, Sisson contacted law enforcement. I.A. gave a forensic interview to Mary Pat Hansen, APRN, on November 9, 2016, in which she told Hansen about the sexual truth or dare game in Twardoski's car. I.A. did not tell Hansen about the sexual truth or dare game Hill used to sexually abuse her. On March 24, 2017, the State charged Twardoski with one count of sexual assault, three counts of sexual intercourse without consent, and one count of sexual abuse of children, all felonies.

¶9     On May 23, 2017, law enforcement received a tip that Hill and I.A. were involved in an inappropriate sexual relationship. I.A. was forensically interviewed by Val Widmer regarding her relationship with Hill in June of 2017. At this forensic interview, I.A.

repeatedly denied any sexual relationship with Hill. In December 2017, Hill, who was on probation after a felony DUI, was arrested on a probation violation and placed in the Ravalli County Detention Center. On January 3, 2018, Hill called I.A. from jail. The call was recorded. During the call, I.A. informed Hill she had told her grandmother about their relationship. On January 5, 2018, I.A. was again forensically interviewed by Widmer. During this interview, I.A. admitted she lied about her relationship with Hill during the June 2017 forensic interview. I.A. told the forensic interviewer the sexual relationship with Hill began on June 27, 2016, when she stayed at Hill's place and the two played a sexual game of truth or dare. I.A. also described to the interviewer the year-and-a-half long "relationship" she had with Hill and the numerous instances of sexual abuse he inflicted on her.

¶10 On March 5, 2018, Hill was charged in District Court with four counts of sexual intercourse without consent, one count of attempted sexual intercourse without consent, and one count of sexual abuse of children, all felonies, for his sexual abuse of I.A. On May 8, 2018, the State filed a motion in limine which sought an order precluding Twardoski from introducing evidence of Hill's sexual abuse of I.A. under § 45-5-511(2), MCA, Montana's rape shield statute. On May 17, 2018, Twardoski filed the Defendant's Motion to Compel Production of Potential Exculpatory Evidence, seeking information from the State, including confidential criminal justice information from the criminal file, regarding Hill. After the parties briefed the motions, the District Court held a hearing on May 29, 2018. The State provided the court with Hill's file for an in camera review. On

June 1, 2018, the District Court issued its Order Re: Cody Hill – CCJI.[1]  In this order, the court held evidence of Hill's sexual abuse of I.A. was excluded under the rape shield statute, subject to the State's presentation of evidence at trial, and denied Twardoski's motion to compel production of the State's Hill file.  The court did turn over pages 1-12 of the Hill file to Twardoski, which contained the offense report which led to Hill's criminal charges.

¶11    Twardoski's trial was held from June 11-13 and 15, 2018.  At trial, the jury heard testimony from I.A., her mother, her grandmother, her cousin, her aunt, Hansen, Sisson, Ravalli County Sheriff's Office Detective Chris Albright, Twardoski, Richard Churchill, and Shellie McDonald.  The tape of I.A.'s forensic interview with Hansen was also played at trial.  Outside the presence of the jury, counsel for Twardoski repeatedly requested permission to question witnesses about Hill.  With the limited exception of allowing I.A. to confirm Hill was her boss and acted as a "father figure" to her, counsel's requests for permission to pose questions about Hill were denied by the District Court.  Mid-trial, on June 13, 2018, Twardoski filed the Defendant's Notice of Intent to Testify and Motion to Address Issues Regarding Cody Lee Hill and Motion to Allow Appearance of Cody Lee Hill.  The District Court issued its Order Re Cody Lee Hill that same day, denying Twardoski permission to testify regarding Hill and quashing a subpoena for Hill to testify at trial.  The jury convicted Twardoski on all counts.  Twardoski was sentenced to

---

[1] CCJI means "confidential criminal justice information" and includes, among other things, "criminal investigative information[.]"  Section 44-5-103(3), MCA.

concurrent sentences of 50 years of incarceration, with 25 years suspended, on each count, and designated a Tier II sexual offender. Hill ultimately pled guilty to all charges relating to his sexual abuse of I.A. and was sentenced to eighty years in prison.

¶12 Twardoski appeals. Additional facts will be discussed as necessary below.

## STANDARD OF REVIEW

¶13 We review a district court's decision regarding matters of discovery for an abuse of discretion. *State v. Pope*, 2019 MT 200, ¶ 10, 397 Mont. 95, 447 P.3d 469 (*Pope II*) (citing *State v. Pope*, 2017 MT 12, ¶ 16, 386 Mont. 194, 387 P.3d 870 (*Pope I*)). "A district court abuses its discretion if it acts arbitrarily, unreasonably, or without employing conscientious judgment, resulting in substantial injustice." *Pope II*, ¶ 10 (citing *State v. Hart*, 2009 MT 268, ¶ 9, 352 Mont. 92, 214 P.3d 1273).

¶14 A district court has broad discretion to determine the admissibility of evidence and we generally review evidentiary rulings for an abuse of discretion. *State v. Walker*, 2018 MT 312, ¶ 11, 394 Mont. 1, 433 P.3d 202 (citing *State v. Madplume*, 2017 MT 40, ¶ 19, 386 Mont. 368, 390 P.3d 142). While a district court has broad discretion when determining the relevancy and admissibility of evidence, it is bound by the Rules of Evidence and applicable statutes in exercising its discretion. *State v. Lake*, 2019 MT 172, ¶ 22, 396 Mont. 390, 445 P.3d 1211 (citations omitted). Where a district court's evidentiary ruling is based on its interpretation of a statute, this Court reviews the district court's ruling de novo for correctness. *Lake*, ¶ 22.

**DISCUSSION**

¶15   *1. Whether the District Court abused its discretion by not requiring the State to provide additional Confidential Criminal Justice Information from the Cody Hill investigation after it conducted an in camera review of the file.*

¶16   Twardoski asserts the District Court erred by not disclosing more confidential criminal justice information from the Cody Hill file to him. Twardoski also takes issue with the District Court's order stating it "reviewed *in camera* the 124 pages of Hill/DC 18-76 CCJI and determine[d] it contains no exculpatory evidence favorable to Twardoski." Twardoski asserts this language gives no indication the District Court "reviewed the audio, video and photograph image files." Despite determining the Hill file contained no exculpatory evidence to Twardoski, the District Court nevertheless ordered the State to turn over pages 1-12 of the file, "to ensure Twardoski has access to sufficient cross-examination material, <u>only if</u> such use is permitted by the [c]ourt." Pages 1-12 contain the offense report which led to Hill's criminal charges. The State asserts the District Court did not abuse its discretion by denying Twardoski the opportunity to review the rest of the Hill file.

¶17   "A defendant has a right to discover exculpatory evidence." *State v. Stutzman*, 2017 MT 169, ¶ 28, 388 Mont. 133, 398 P.3d 265 (citing *State v. Duffy*, 2000 MT 186, ¶ 19, 300 Mont. 381, 6 P.3d 453). A defendant's right to discover exculpatory evidence is derived from the right to confront witnesses. *Duffy*, ¶ 19 (citing *State v. Reynolds*, 243 Mont. 1, 7, 792 P.2d 1111, 1115 (1990)). Exculpatory evidence "includes that which is favorable to the accused and material to either guilt or to punishment," regardless of whether that evidence is ultimately admissible at trial. *Stutzman*, ¶ 28 (citations omitted). Favorable

8

evidence includes evidence which could potentially lead directly to admissible exculpatory evidence. *Stutzman*, ¶ 28 (citing *State v. Weisbarth*, 2016 MT 214, ¶ 24, 384 Mont. 424, 378 P.3d 1195).

¶18 "When a defendant requests a crime victim's confidential records, the district court has a 'duty to conduct an in camera review to ascertain whether there [is] any exculpatory evidence in the files.'" *Stutzman*, ¶ 29 (quoting *State v. Johnston*, 2014 MT 329, ¶ 9, 377 Mont. 291, 339 P.3d 829). If the confidential information within the records is not exculpatory or necessary for the preparation of the defense, a defendant's right to review the information is outweighed by the victim's right to confidentiality. *Duffy*, ¶ 21. Confidential criminal justice information may be disseminated "to those authorized to receive it by a district court[.]" Section 44-5-303(1), MCA.

¶19 We begin with Twardoski's complaint regarding the District Court's statement it "reviewed *in camera* the 124 pages of Hill/DC 18-76 CCJI and determine[d] it contains no exculpatory evidence favorable to Twardoski." Twardoski asserts this gives no indication of whether the court reviewed anything beyond the 124 pages of the file, including audio, video, photographs, and cell phone information. Elsewhere in its order, however, the District Court repeatedly referenced the "Hill/DC 18-76 evidence," "Hill/DC 18-76 related evidence," and "Hill/DC 18-76 notes and all related CCJI[.]" The State notes the District Court's order gives no indication it did not conduct an in camera review of the entire Hill file.

¶20 We have independently reviewed the entirety of the Hill CCJI file and agree with the District Court that no exculpatory evidence favorable to Twardoski exists beyond what

9

he was already given by the District Court's order turning over pages 1-12 of that file. Beyond the 124 Bates-stamped pages, the file also contains photographs, video and audio recordings, and information extracted from both Hill's and I.A.'s cell phones. None of the evidence contained within the file contains information previously unknown to Twardoski, and the offense report (pages 1-12 of the file) provided to Twardoski by the District Court succinctly summarizes the evidence contained within the remaining 112 pages. The cell phone extractions provided little evidence, and none related to Twardoski or provided further evidence of the abuse by Hill beyond that contained in pages 1-12 of the investigative file. The photographs in the file contained pictures of Hill's body, residence, and trash and are similarly not exculpatory evidence to which Twardoski would be entitled. The content of the audio recording of Hill's jailhouse call to I.A. was already known to Twardoski. Finally, the content of the video recordings in the file was also known to Twardoski. The District Court correctly conducted an in camera review of the Hill file and turned over pages 1-12 of that file to Twardoski. The remainder of the file was neither exculpatory to Twardoski nor necessary for the preparation of his defense, as Twardoski already knew the information contained within. Twardoski therefore was not entitled to more of the Hill CCJI file than what he was provided by the District Court. *Duffy*, ¶ 21.

¶21     While the District Court could perhaps have provided more information to make it clear it reviewed the entire Hill file, we find no abuse of discretion in the court's ultimate decision. The District Court's decision was not arbitrary, unreasonable, or without conscientious judgment, and Twardoski did not suffer a substantial injustice by not receiving the entire Hill file. *Pope II*, ¶ 10. The District Court is affirmed on this issue.

¶22 *2. Whether the District Court erred by excluding evidence of Cody Hill's near contemporaneous sexual abuse of I.A., thereby violating Twardoski's constitutional right to present a defense.*

¶23 We turn now to the District Court's exclusion of the Cody Hill evidence from Twardoski's trial. The court ruled the evidence was excluded pursuant to Montana's rape shield statute. Twardoski asserts the exclusion of this evidence violated his constitutional right to confront his accuser and present a defense. The State argues the District Court properly precluded Twardoski from presenting the Hill evidence at trial because that evidence was barred by application of the rape shield statute.

¶24 Montana's rape shield statute states, in relevant part, that "[e]vidence concerning the sexual conduct of the victim is inadmissible in prosecutions under this part except evidence of the victim's past sexual conduct with the offender or evidence of specific instances of the victim's sexual activity to show the origin of semen, pregnancy, or disease that is at issue in the prosecution." Section 45-5-511(2), MCA. "The purpose of the rape shield statute is to prevent the trial from becoming a trial of the victim." *State v. MacKinnon*, 1998 MT 78, ¶ 35, 288 Mont. 329, 957 P.2d 23 (quoting *State v. Weeks*, 270 Mont. 63, 89, 891 P.2d 477, 493 (1995)). We have previously noted that "[c]onflict can arise between the rape shield statute and a defendant's rights to confront his accuser and present evidence at trial in defense of the charge against him." *State v. Colburn*, 2016 MT 41, ¶ 24, 382 Mont. 223, 366 P.3d 258 (*Colburn I*).

¶25 In this case, Twardoski's defense was that I.A. fabricated the allegations against him—essentially alleging I.A. transferred the abuse actually committed on her by Hill, who I.A. liked, to Twardoski, who I.A. despised. Twardoski alleged I.A. had a motive to

11

fabricate the allegations because her mother was a drug addict who used drugs with him—removing Twardoski from the equation would remove her mother's easy access to the drugs which were destroying her (and I.A.'s) life.

¶26 While a district court has broad discretion when determining the relevancy and admissibility of evidence, it is bound by the Rules of Evidence and applicable statutes in exercising its discretion. *Lake*, ¶ 22. Where a district court's evidentiary ruling is based on its interpretation of a statute, this Court reviews the district court's ruling de novo for correctness. *Lake*, ¶ 22. We also review a district court's application of a statute for correctness. *State v. Aguado*, 2017 MT 54, ¶ 9, 387 Mont. 1, 390 P.3d 628 (citing *Colburn I*, ¶ 6). Accordingly, on appeal, this Court is tasked with determining whether the District Court's evidentiary ruling—preventing Twardoski from presenting evidence of I.A.'s sexual abuse during the game of truth or dare with Hill—was correct as its ruling was based on its interpretation and application of Montana's rape shield statute.[2]

---

[2] The Dissent asserts the correct standard of review for this Court reviewing a district court's "application of the rape shield provisions is a manifest abuse of discretion standard." Dissent, ¶ 41 (quoting *State v. Stuit*, 268 Mont. 176, 183, 885 P.2d 1290, 1295 (1994)). It further notes that "[o]ur cases have not always clearly articulated the standard to be applied upon appellate review of evidentiary decisions under the Rape Shield Statute." Dissent, ¶ 41 n.1. It is true that, for many years, this Court appeared to vacillate between reviewing such decisions for an abuse of discretion and de novo for correctness. *Compare Stuit*, 268 Mont. at 183, 885 P.2d at 1295, *with State v. Steffes*, 269 Mont. 214, 231, 887 P.2d 1196, 1206 (1994). Our recent case law on this matter, however, makes it clear de novo review is required for appellate review of a district court's decision to exclude evidence pursuant to the rape shield statute, as such decisions necessarily implicate a defendant's constitutional right to confront witnesses and present a complete defense. *See, e.g., Lake*, ¶¶ 22, 42; *Walker*, ¶¶ 11, 59; *State v. Daffin*, 2017 MT 76, ¶ 13, 387 Mont. 154, 392 P.3d 150; *Aguado*, ¶ 9; *State v. Awbery*, 2016 MT 48, ¶ 10, 382 Mont. 334, 367 P.3d 346; *Colburn I*, ¶ 6; and *State v. Patterson*, 2012 MT 282, ¶ 10, 367 Mont. 186, 291 P.3d 556, *overruled, in part, on other grounds by City of Helena v. Frankforter*, 2018 MT 193, ¶¶ 13-14, 392 Mont. 277, 423 P.3d 581. *See also Colburn I*, ¶ 38 (McKinnon, J., concurring) (noting that because the district court's interpretation and application of the rape shield statute implicated Colburn's right

¶27 Under the rape shield statute, a "court balancing the interests of the defendant with those protected by the Rape Shield Law should require that the defendant's proffered evidence is not merely speculative or unsupported." *State v. Awbery*, 2016 MT 48, ¶ 20, 382 Mont. 334, 367 P.3d 346. The court should also consider whether the proffered evidence is relevant and probative under M. R. Evid. 401 and 402, whether the evidence is merely cumulative of other admissible evidence, and whether the probative value of the evidence is outweighed by its prejudicial effect under M. R. Evid. 403. *Awbery*, ¶ 20 (citations omitted). The court must balance these considerations to ensure a fair trial for the defendant while also "upholding the compelling interest of the Rape Shield Law in preserving the integrity of the trial and keeping it from becoming a trial of the victim." *Awbery*, ¶ 20 (citing *State v. Anderson*, 211 Mont. 272, 283, 686 P.2d 193, 199 (1984)).

¶28 Upon our review of the record, we find the evidence of Hill's sexual abuse of I.A. was neither speculative nor unsupported. By the time Twardoski discovered Hill had been sexually abusing I.A. during the time period she accused Twardoski of abuse and sought to introduce such evidence, the State had already charged Hill with four counts of sexual

---

to a fair trial, de novo review of the district court's decision was required). Further, we note *Stuit*'s claim that the "standard of review for the application of the rape shield provisions is a manifest abuse of discretion," *Stuit*, 268 Mont. at 183, 885 P.2d at 1295 cites to *State v. Howell*, 254 Mont. 438, 445, 839 P.2d 87, 91 (1992), and *State v. Van Dyken*, 242 Mont. 415, 435, 791 P.2d 1350, 1362-63 (1990), for this contention. *Howell* similarly claimed that "the standard of review for [application of the rape shield statute] is manifest abuse of discretion," *Howell*, 254 Mont. at 445, 839 P.2d at 911, citing only to *Van Dyken* for this contention. *Van Dyken* involved the rebuttal testimony of an expert witness in a deliberate homicide case, and did not involve the interpretation or application of the rape shield statute in any way. To the extent *Stuit* and *Howell* relied on *Van Dyken* to determine the standard of review for the application of the rape shield statute is for a "manifest abuse of discretion," they were, and are, incorrect.

intercourse without consent, one count of attempted sexual intercourse without consent, and one count of sexual abuse of children for his conduct with I.A.[3] After first lying to a forensic interviewer about the sexual relationship with Hill in June of 2017, I.A. disclosed the abuse in a second forensic interview in January of 2018. During this interview, I.A. specifically noted Hill's sexual abuse began on June 27, 2016, when the two played a sexual game of "truth or dare" identical in nature to her allegations against Twardoski. In addition, prior to the second forensic interview, a jailhouse call from Hill to I.A. discussing their relationship was recorded while Hill was incarcerated for a different matter.

¶29 Turning to whether the evidence of Hill's sexual abuse of I.A. was relevant and admissible, we conclude it is both relevant and admissible. M. R. Evid. 401 defines relevant evidence to include "evidence bearing upon the credibility of a witness," and, pursuant to M. R. Evid. 402, generally "relevant evidence is admissible[.]" "M. R. Evid. 403 provides that, although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." *State v. Colburn*, 2018 MT 141, ¶ 16, 391 Mont. 449, 419 P.3d 1196 (*Colburn II*) (citing *State v. Ankeny*, 2018 MT 91, ¶ 33, 391 Mont. 176, 417 P.3d 275).

¶30 Here, the probative value of the evidence of Hill's sexual abuse of I.A. through the use of sexual "truth or dare" just 13 days before the incident with Twardoski is not

---

[3] As previously noted, Hill pled guilty to all counts and was sentenced to eighty years in prison.

"substantially outweighed" by any of the considerations listed in M. R. Evid. 403. Twardoski's sole defense to I.A.'s allegations was that I.A. fabricated the allegations against him. With no physical evidence in this case, Twardoski's defense was entirely dependent on undermining I.A.'s credibility.

¶31 A defendant charged with a crime has constitutional rights under both the Sixth Amendment to the United States Constitution and Article II, Section 24 of the Montana Constitution to both confront his or her accuser and to present evidence in his or her defense. *Colburn I*, ¶ 24 (citations omitted); *Lake*, ¶ 19 (citations omitted). "[T]he Constitution guarantees criminal defendants a meaningful opportunity to present a complete defense." *State v. Reams*, 2020 MT 326, ¶ 18, 402 Mont. 366, 477 P.3d 1118 (quoting *State v. Glick*, 2009 MT 44, ¶ 29, 349 Mont. 277, 203 P.3d 796). "A district court may not apply the Rape Shield Law to bar *all* evidence concerning a victim's past sexual conduct." *Lake*, ¶ 28 (citing *Walker*, ¶ 55) (emphasis in original).

¶32 Twardoski argues he was denied his constitutional right to present a complete defense by the District Court's preclusion of the evidence of Hill's sexual abuse of I.A. We agree. As in *Colburn I*, Twardoski's "defense to the charges . . . depended upon undermining the credibility" of I.A.'s account that he sexually abused her. *Colburn I*, ¶ 27. "Cross-examination is the principal means by which the believability of a witness and the truth of his testimony are tested." *Davis v. Alaska*, 415 U.S. 308, 316, 94 S. Ct. 1105, 1110 (1974). At trial, the State presented I.A. as an immature, isolated, and home-schooled young girl, essentially living on a commune in the country with her family. I.A. then took the stand and described, in explicit detail, being sexually abused by Twardoski during a

15

game of sexual "truth or dare." The clear implication of this presentation of evidence is that I.A. was someone who could both be taken advantage of by an abuser and who would not be able to specifically describe the explicit acts if the game had not occurred. In addition, I.A. testified she was familiar with the game of truth or dare before Twardoski's alleged abuse because she had previously played "an innocent game" of truth or dare with friends. She also testified she played truth or dare with Cody Hill. Due to the District Court's ruling which precluded Twardoski from presenting evidence regarding Hill, Twardoski was prevented from effectively cross-examining I.A.'s veracity regarding her testimony she knew truth or dare as "an innocent game" before the incident during the drive with Twardoski. In fact, I.A. had, less than two weeks beforehand, been sexually abused by Hill through his use of a sexual game of truth or dare identical to that I.A. alleged against Twardoski. Further, the game's escalating sexual "dares" followed a near exact similar progression as that I.A. alleged Twardoski used on her during their driving lesson. Twardoski was also precluded from presenting evidence I.A. was willing to, and had, lied to protect Hill during the June 2017 forensic interview, which would again bear on her credibility.

¶33 Twardoski, in addition to alleging I.A. had a motive to fabricate the allegations against him due to his drug use with (and supply to) I.A.'s mother, also alleged I.A.'s detailed sexual knowledge came from her involvement with Cody Hill. In *Colburn I*, we reversed a district court's application of the rape shield statute under similar circumstances. *See Colburn I*, ¶¶ 26, 29. There was essentially a straight-line correlation between the victim's prior abuse and the allegations against Colburn. *See Colburn I*, ¶¶ 20, 26. The

16

District Court here compared Twardoski's proffered defense to that of *Awbery*. The facts of this case are very different from the facts of *Awbery*.

¶34 In *Awbery*, a defendant sought to introduce evidence of prior sexual abuse to demonstrate the victims suffered from post-traumatic stress disorder (PTSD) due to the prior sexual assaults, with the implication that therefore their allegations against him were erroneous due to the effects of PTSD. *Awbery*, ¶ 13. The district court precluded the evidence of prior assaults, noting PTSD was not diagnosed in the victims prior to Awbery's offenses and that there was "no evidence that there was any similarity between the prior incidents and Awbery's offenses[.]" *Awbery*, ¶ 15. We upheld the district court's ruling, noting that Awbery's theory "never progressed past conjecture and speculation." *Awbery*, ¶ 21. Unlike the straight-line connection between the prior abuse and allegation in *Colburn I*, connecting the dots between the prior abuses and Awbery's PTSD defense was "far less certain and far more complicated." *Awbery*, ¶ 40 (Cotter, Baker, and McKinnon, JJ., concurring).

¶35 Here, as in *Colburn I*, there is a straight-line connection between I.A.'s prior sexual abuse by Hill and the allegations she made against Twardoski—the nature and circumstances of the allegations are quite unique and near identical right down to the very distinct allegation of enticing I.A. to play sexual "truth or dare" with the "dares" being identical in nature to those perpetrated by Hill. As alleged by Twardoski, I.A. had a motive to fabricate the allegations against him as she sought to remove him, and his supply of drugs, from her drug-addicted mother's life. The State, and the District Court, allege I.A. could have simply told the police Twardoski was using and supplying methamphetamine

17

and other illegal drugs to her mother if she just wanted him out of her mother's life. Such a theory neglects the reasonable assumption that I.A. would also be inviting police scrutiny on her mother's illegal drug use. It would be equally reasonable, if not more probable, for I.A. to assume the police would arrest I.A.'s mother for using methamphetamine, and it is clear from the evidence in this case I.A. sought to act as her mother's protector and would not want her mother to be arrested or sent to jail. Twardoski should have been allowed to present the Hill evidence to demonstrate I.A.'s knowledge of specific sexual activity—an escalating sexual game of truth or dare and the sexual acts that were part of that game—came from Hill's abuse in support of his theory she fabricated the allegations against him.

¶36 After our de novo review of the record, we conclude the District Court erred when it determined Montana's rape shield statute prevented Twardoski from presenting evidence Hill abused I.A. in both a unique and identical manner less than two weeks before the incident at issue in this case. *Lake*, ¶ 22. The District Court's ruling frustrated Twardoski from both confronting his accuser and presenting evidence in his defense. *Colburn I*, ¶ 24; *Lake*, ¶ 19. As the District Court incorrectly applied the rape shield statute and "the Constitution guarantees criminal defendants a meaningful opportunity to present a complete defense," *Reams*, ¶ 18, Twardoski should have been allowed to present the Hill evidence at trial. Because he was not allowed to do so, a new trial is required in this case.

**CONCLUSION**

¶37 The District Court did not err when it determined, following its in camera inspection of the Cody Hill file, there was not other relevant information which should have been disclosed to Twardoski. The District Court erred, however, by misapplying Montana's

18

rape shield statute and violated Twardoski's constitutional rights to confront his accuser and present evidence in his defense by disallowing evidence Hill abused I.A. in both a unique and identical manner less than two weeks before the incident at issue in this case. As such, we reverse and remand to the District Court for a new trial consistent with this Opinion.

¶38   Affirmed in part, reversed in part, and remanded for a new trial.


/S/ INGRID GUSTAFSON


We concur:

/S/ JAMES JEREMIAH SHEA
/S/ LAURIE McKINNON
/S/ DIRK M. SANDEFUR


Justice Jim Rice, concurring in part and dissenting in part.

¶39   I concur with Issue 1 but dissent from Issue 2.

¶40   Trial evidentiary decisions are generally reviewed for abuse of discretion, and the trial court is given "broad discretion" to determine the admissibility of evidence. *State v. Lake*, 2019 MT 172, ¶ 22, 396 Mont. 390, 445 P.3d 1211. The Court acknowledges these principles, but does not review this evidentiary ruling for abuse of discretion. Rather, the Court conducts *de novo* review, reasoning that the District Court's decision was based on an "interpretation" of the Rape Shield Statute. Opinion, ¶¶ 26, 36. I disagree with this conclusion.

¶41 While interpretation of a statute is an issue of law, the Rape Shield Statute was not interpreted here. *See State v. Walker*, 2018 MT 312, ¶ 11, 394 Mont. 1, 433 P.3d 202 (noting that "to the extent the court's ruling is based on its *interpretation* of an evidentiary rule or statute, our review is de novo") (emphasis added). That is, the District Court precisely followed this Court's previous interpretation of the statute to undertake the required balancing of interests. The District Court began by reasoning that, "[i]n balancing the competing rights [protecting the victim from evidence of past sexual actions and ensuring the defendant's rights to due process and confrontation], the Court applies the test recently articulated in *State v. Awbery*, 2016 MT 48, ¶ 20, 382 Mont. 334, 367 P.3d 346." The District Court then assessed the evidentiary considerations with repeated citations to the test or principles this Court utilized in *Awbery* and in *State v. Colburn*, 2016 MT 41, 382 Mont. 223, 366 P.3d 258, and did not premise its ruling upon an interpretation of the Statute. Thus, appellate review of the District Court's ruling does not present a binary decision of correctness, but an assessment of the District Court's balancing of interests under the particular circumstances of this case. The reasoning of the Court's Opinion—that *de novo* review is necessary because "this Court is tasked with determining whether the District Court's evidentiary ruling . . . was correct[,] as its ruling was based upon its interpretation and application of Montana's rape shield statute[,]" Opinion, ¶ 26—would require *de novo* review of all Rape Shield trial rulings, because the Statute is always "applied" in the requisite balancing process. We have held that "[t]he standard of review

20

for the application of the rape shield provisions is a manifest abuse of discretion standard."

*State v. Stuit*, 268 Mont. 176, 183, 885 P.2d 1290, 1295 (1994).[1]

¶42    The Court tells a simple "straight-line" story, Opinion, ¶¶ 33, 34, which gives the impression I.A. was an isolated minor who offered two identical accounts of being sexually abused by two adult men, 13 days apart, but the Opinion's version of the story does not provide a full and accurate rendering of the record, in my view.  More concerning, I believe the Court's reasoning stereotypes minor victims and undercuts the protections of the Rape Shield Statute, especially for minors who have been abused more than once.  Sadly, that is not an uncommon occurrence.  *See Colburn*, ¶¶ 20, 26; *Awbery*, ¶ 12; *State v. MacKinnon*, 1998 MT 78, ¶ 9, 288 Mont. 329, 957 P.2d 23.

¶43    On July 10, 2016, I.A.'s Mother had promised to take I.A. for a driving lesson, but was temporarily incapacitated from drug usage.  I.A. reluctantly agreed to accept a driving

---

[1] Our cases have not always clearly articulated the standard to be applied upon appellate review of evidentiary decisions under the Rape Shield Statute.  *See, e.g.*, *Colburn*, ¶ 29 (noting that "[t]he District Court abused its discretion by mechanistically applying the Rape Shield Law to exclude Colburn's proffered evidence").  However, I believe our cases can be reconciled by clarifying we exercise *de novo* review of rulings that interpret the substance of the Statute, as stated in *Walker*, while reviewing for abuse of discretion a trial court's balancing of interests based upon the evidentiary circumstances of each case, as stated in *Stuit*.  An abuse of discretion review is consistent with our review of evidentiary inquiries we require the trial court to make in conjunction with the Rape Shield Statute: "[t]he court should consider whether the evidence is relevant and probative (Rules 401 and 402, M. R. Evid.); whether the evidence is merely cumulative of other admissible evidence; and whether the probative value of the evidence is outweighed by its prejudicial effect (Rule 403, M. R. Evid.)[.]"  *Awbery*, ¶ 20.  I believe the particular decision made here by the District Court is reviewable for abuse of discretion.  *See also*, Robert Steinbach & Esther Seitz, *Unscrambling the Confusion: Applying the Correct Standard of Review for Rape-Shield Evidentiary Rulings*, 34(2) Am. J. Trial Advoc. 281, 282, 298 (2010) (concluding, after noting "[u]nder various states' case law, the applicable standard of review in evaluating a trial court's decision to admit or exclude evidence under a rape-shield statute is completely muddled," that "the abuse of discretion standard fits best for review of rape-shield decisions").

lesson from 61-year-old Twardoski, Mother's drug supplier and fellow user, who volunteered to provide one to I.A. When I.A. entered Twardoski's vehicle, she noted the driver side interior door panel was disassembled and not in proper working order, which struck her as odd. The two departed and drove around nearby streets. At one point, Twardoski instructed I.A. to turn into a field and park the car. There, Twardoski asked a series of invasive personal questions and told I.A. she was beautiful, while rubbing her leg. Twardoski then posed that they play a game of "Truth-or-Dare," wherein he challenged I.A. to a series of inappropriate "dares." Fearful of Twardoski's anger, I.A. begrudgingly complied.

¶44 The first dare was for I.A. to show her breasts to Twardoski. I.A. attempted to avoid the task, but when Twardoski would not relent, she complied. Twardoski leaned over and French kissed her, then aggressively groped I.A.'s her right breast, causing pain. Twardoski next dared I.A. to put her hands down his pants, which she did momentarily before withdrawing. Twardoski then dared I.A. to let him put his hand under her shorts, which Twardoski did, shoving two fingers into I.A.'s vagina. Recounting the event, I.A. described a pinching pain when this occurred, and she pulled Twardoski's hand away. Twardoski next exposed his penis to I.A. and requested oral sex from her, which he compelled by pulling I.A.'s head down upon his lap. After less than a minute, I.A. pulled up her head and spit, at which Twardoski laughed. Finally, Twardoski performed oral sex on I.A. Though she initially refused, she relented after Twardoski threatened to tell her family that she had forced herself on him. I.A. testified about having a specific memory of Twardoski's "creepy smile" with missing or misshapen teeth.

22

¶45 On the way back, Twardoski warned I.A. that there would be consequences if she revealed to others what they did. Confused by the disassembled driver's door panel, I.A. was unable to open the door to exit, and Twardoski had to let her out. Mother testified that I.A. exhibited appearances of fear, shame, and anger upon returning to the cabin. I.A. immediately took a shower. Forty-five minutes later, frustrated that Twardoski remained at the cabin, I.A. left and went to the residence of T.A., her cousin who lived nearby. T.A. surmised that I.A. did not want Twardoski at Mother's house, and he went there two or three times that day to inform Mother that Twardoski's presence made I.A. uncomfortable. However, Twardoski remained at the cabin until about 11:30 p.m. The next day, Twardoski returned with fast food for Mother and I.A., and again spoke with I.A. about not telling what had happened.

¶46 Two days after the assault occurred, Mother and Grandmother were arguing in I.A.'s presence regarding Mother's continued interaction with Twardoski and his continued presence at the cabin. During this argument I.A. generally disclosed to Mother and Grandmother what Twardoski had done during the driving lesson. I.A. did not discuss details, stating only that "he touched my body and I didn't like it." As a result, I.A. moved into the main house with her grandparents and began seeing a counselor, while Mother moved to Bozeman to live with her sister to seek recovery from her drug abuse. In late October 2016, I.A. disclosed Twardoski's assault to her counselor, Aleta Sisson, in general terms, merely identifying Twardoski as the perpetrator and stating he had pushed her head into his lap. As a mandatory reporter, Sisson contacted local law enforcement, leading ultimately to charges against Twardoski in March 2017.

¶47 Undisclosed by I.A. during this time and generally unknown was that I.A. was engaged in an ongoing relationship with 39-year-old Cody Hill, a longtime family friend who allowed I.A. to work for him on a ranch where he lived, a relationship that I.A. would describe as a "normal boyfriend-girlfriend relationship." I.A. would initially deny the existence of a sexual relationship to law enforcement, but the abuse was discovered after Hill, who was arrested for violating the terms of his probation for a prior felony, called I.A. from jail on a recorded call. It was in early 2018, a year and a half after disclosing Twardoski's actions on July 10, 2016, that I.A. disclosed the nature of her relationship with Hill. Hill would often take I.A. to work and she would spend the night at his residence so that they could get an early start the next morning. On June 27, 2016, Hill engaged I.A. in a Truth-or-Dare ruse with a series of progressive dares. Hill's dares led to the two of them drinking wine and escalated to massages, fondling, kissing, oral sex, and taking a shower together. Hill warned I.A. of the ramifications if anyone found out what they did and urged her to keep it secret. Hill and I.A. maintained their illicit relationship for a long period, before and after the alleged assault by Twardoski in July 2016. Hill was manipulative of the young I.A., and while I.A. was not old enough to legally consent to sexual intimacy with Hill, she clearly believed that she had voluntarily engaged with Hill. As the District Court found, the sexual relationship between Hill and I.A. was "voluntary yet unlawful."

¶48 There are numerous distinctives between I.A.'s alleged experiences with Hill and Twardoski. First and foremost, I.A. considered Hill, in stark contrast to her experience with Twardoski, to be a volitional relationship partner. Her relationship with Hill extended over an extended period, while her forced traumatic exposure to Twardoski occurred within

24

a single episode on a single day. Even though she was unable to legally consent to sex, I.A. is entitled, under the Rape Shield Statute, to respect of her volitional choices and shielding of her past sexual behaviors in the same manner as an adult, so that Twardoski's trial does not become "a trial of the victim." *Awbery*, ¶ 27; *accord* Mont. Const. art. II, § 15, (declaring that "[t]he rights of persons under 18 years of age shall include, but not be limited to, all the fundamental rights of this Article"). Thus, the relational distinctives at issue here should not be discarded merely because I.A. is a minor. Of course, such recognition does not end the analysis, but this point should not be lost: Twardoski is seeking to admit evidence of I.A.'s past volitional sexual actions in a trial about his forced sexual actions upon her.

¶49    I.A. reported that she and Hill drank wine on June 27, 2016; there was no report of wine with Twardoski on July 10, 2016. Twardoski's alleged abuse occurred in a car, Hill's in a house. I.A. described Twardoski's car as uniquely having a broken door that hindered her from exiting; I.A. was not physically trapped with Hill. I.A. reported being repulsed during oral sex by Twardoski's "creepy smile" with missing or misplaced teeth. Twardoski's actions were followed by I.A. acting with fear, shame and anger; no such reaction is evidenced by I.A. following her time with Hill. After Twardoski's abuse, I.A. immediately showered and then withdrew to her cousin's place to get away from Twardoski, being so upset that her cousin attempted several times to have her Mother make Twardoski leave; no such reactions are reflected with Hill. Twardoski returned the next day with food and again warned I.A. not to tell anyone.

¶50     The Court's oversimplified reasoning is that because I.A., a minor, reported similar sexual acts committed by adult men within a short period, evidence of her prior acts must be admissible, essentially as a matter of law.  However, needless to say, sexually intimate acts such as oral sex are commonly engaged in, and such commonality alone should not serve to weaken the Rape Shield Statute, especially when a minor is the victim.  Indeed, as the District Court reasoned, "it could just as well be argued" that I.A. "falsely imputed onto Hill the actions of Twardoski [] when she disclosed her relationship with Hill 1 ½ years later."  Nor is the Truth-or-Dare ruse particularly material in the context of child sexual abuse.  I.A. testified to being aware of the "game" from her own social circles, and use of such sex games is a recognized tool for sexual grooming of minors by their molesters.  *See generally*, Georgia M. Winters & Elizabeth L. Jeglic, *Stages of Sexual Grooming: Recognizing Potentially Predatory Behaviors of Child Molesters* 38:6, Deviant Behavior, 724, 724-33 (2017).  The Court's comparison of I.A.'s experiences fails to account for the most important evidence about the assaults:  I.A.'s recollection of, and reaction to, each.  The record reflects that I.A. expressed and demonstrated fear, shame, anger, revulsion, a feeling of uncleanness, frustration, flight, and anxiety following Twardoski's alleged assault.  In contrast, I.A. portrayed her relationship with Hill to be a "normal boyfriend-girlfriend relationship."  These distinctives, particularly the many unique facts

26

presented by I.A.'s report about Twardoski's assault absent from her account about Hill, must also be considered.[2]

¶51 On trial evidentiary matters, a district court "abuses its discretion when it acts arbitrarily without the employment of conscientious judgment or exceeds the bounds of reason, resulting in substantial injustice." *State v. Smith*, 2021 MT 148, ¶ 14, 404 Mont. 245, ___ P.3d ___ (citation omitted); *see also Chipman v. Northwest Healthcare Corp.*, 2012 MT 242, ¶ 17, 366 Mont. 450, 288 P.3d 193 (noting that "[t]he abuse of discretion question 'is not whether this Court would have reached the same decision, but, whether the district court acted arbitrarily without conscientious judgment or exceeded the bounds of reason'") (quoting *Newman v. Lichfield*, 2012 MT 47, ¶ 22, 364 Mont. 243, 272 P.3d 625). The District Court's ruling in this matter should be reviewed on appeal for abuse of discretion, and I would conclude the ruling was neither arbitrary nor lacking in conscientious judgment for several reasons. First, during the trial, the District Court permitted Twardoski to address his asserted premise that I.A. had falsely accused him in "revenge" for his negative influence upon her Mother, the purpose for which he sought admission of I.A.'s interactions with Hill. During cross examination of I.A., defense counsel asked several questions to probe this motive, concluding with the following direct exchange:

> Defense: Were you [accusing Twardoski of sexual abuse] to protect your mom, to get Mr. Twardoski out of her life?

---

[2] To reiterate, this comparison in no way approves of Hill's "voluntary yet unlawful" abusive relationship with I.A., but simply notes the evidentiary distinctions that should be credited in the current case involving Twardoski.

I.A.: Are you trying to say I lied?

Defense: No. I'm asking if you made that disclosure to protect your mom from Mr. Twardoski.

I.A.: No. I told my mother and my grandmother because I wanted to tell them.

Defense: Pass the witness.

This exchange was preceded by testimony indicating that I.A. was Mother's primary caretaker and that I.A. was unhappy with Mother's interactions with Twardoski, all of which placed the revenge theory before the jury.

¶52 Although permitting Twardoski to inquire about his "revenge theory"—that I.A. was merely fabricating the allegations to remove him from Mother's and her life—the District Court, for purposes of its Rape Shield Statute analysis, found the theory entirely speculative, because there was no evidence to support it outside of Twardoski's self-condemning (and self-serving) bad behaviors (determining that "Twardoski provides no facts, other than conceding his long-term methamphetamine use with I.A.'s mother, to explain why I.A. would choose to fabricate these sexual assault allegations"). We have held that the Constitution "does not require a blanket exception to rape shield statutes for all evidence related to *motive to fabricate. Speculative or unsupported allegations are insufficient* to tip the scales in favor of a defendant's right to present a defense and against the victim's rights under the rape shield statute." *State v. Johnson*, 1998 MT 107, ¶ 24, 288 Mont. 513, 958 P.2d 1182 (emphasis added). The Court makes the unremarkable determination that the *abuse by Hill* was "neither speculative nor unsupported," Opinion,

28

¶ 28, and I agree it was not, but that is not the issue; the question is whether *the revenge theory* as I.A.'s motive was speculative, and it was. Its speculative nature, combined with the opportunity the District Court nonetheless permitted Twardoski to pursue at trial, demonstrates that Twardoski's constitutional trial rights were protected without a need to open an inquiry into I.A.'s past sexual behaviors. *Johnson*, ¶ 24.

¶53 The same trial judge who presided in *Colburn* also presided in this case, and the judge carefully considered and balanced the competing interests at issue as required by that case and our subsequent decision in *Awbery*. There were not only substantial differences between I.A.'s two accounts, given over a year and a half apart, but also substantial risks permitting an inquiry into I.A.'s relationship with Hill. The District Court reasoned that admission of this evidence "would certainly place a prejudicial stamp on [I.A.'s] general character and reputation," citing *State v. Anderson*, 211 Mont. 272, 286, 686 P.2d 193, 201 (1984) (internal quotations omitted), and that there was "an exceptionally high likelihood of confusing the issues in the case against Twardoski, misleading the jury, and [creating] a trial within a trial regarding I.A.'s abuse by Hill[.] This all but guarantees jury confusion."

¶54 I would conclude the District Court did not abuse its discretion and affirm the conviction. On this record, Twardoski's rights were amply protected, and I.A. was entitled to the protections of the Rape Shield Statute. Thus, even under *de novo* review, I would affirm.

/S/ JIM RICE

29